<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JIAHERB INC., | |
| *Plaintiff*, | Civil No.: 18-cv-15532 (KSH) (CLW) |
| v. | |
| MTC INDUSTRIES, INC., | <u>**OPINION**</u> |
| *Defendant*. | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

### I.    Introduction

Jiaherb, Inc. ("Jiaherb") has sued MTC Industries, Inc. ("MTC"), alleging that the saw palmetto oil it purchased from MTC was intentionally adulterated in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the parties' contract of sale, among other claims arising out of the Uniform Commercial Code and state law. Following motion practice, the Court held a four-day bench trial. As required by Fed. R. Civ. P. 52(a)(1), the Court now issues its findings of fact and conclusions of law.

### II.    Background & Procedural History

Jiaherb and MTC are each in the business of manufacturing and selling natural ingredients used in the dietary supplement industry. In 2018, a dispute arose between them over the quality of certain batches of saw palmetto oil, a supplement with potential health benefits, that MTC sold to Jiaherb in 2016 and 2017. Jiaherb claims that testing it ordered reveals that the product was adulterated with coconut oil.

Jiaherb's initial complaint, filed on October 31, 2018, asserted seven counts, including a claim for false advertising and unfair competition under Section 43(a) of the Lanham Act. (D.E.

1.)  MTC moved to dismiss that count because the complaint alleged that Jiaherb's injury stemmed from a purchaser/supplier relationship with MTC, which precludes a Section 43(a) claim.  The Court dismissed the claim without prejudice, holding that amendment would not be futile if Jiaherb could sufficiently plead a competitive relationship with MTC and that it suffered "an injury to a commercial interest in reputation or sales" sufficient to confer it statutory standing.  (D.E. 41, Mot. to Dismiss Op., at 5, 7-8 (citation omitted).)

Jiaherb successfully amended, and the operative amended complaint alleges violations of the Lanham Act (Count One), fraudulent inducement (Count Two), breach of contract (Count Three), breach of the implied covenant of good faith and fair dealing (Count Four), breach of the implied warranty of fitness for a particular purpose (Count Five), breach of the implied warranty of merchantability (Count Six), and unjust enrichment (Count Seven).  (D.E. 85, Am. Compl.)[1]

A bench trial was held on March 10, 14, 17, and 18, 2025.[2]  Seven witnesses testified, including an expert on each side.  Jiaherb called Scott Chen, Jiaherb's president; Xiaohong Wang, Jiaherb's quality control manager; Min Du, a representative from Isura laboratories ("Isura"); and James P. Kababick, offered as an expert on adulteration detection in supplements.

---

[1]  On June 3, 2022, nearly two years after it answered Jiaherb's amended complaint and four years after it answered Jiaherb's first complaint, MTC moved to amend its answer to add counterclaims for trade secret misappropriation.  (D.E. 116.)  Jiaherb opposed.  (D.E. 119.)  The Court dismissed the counterclaims with prejudice, finding that MTC failed to plead that a protectable trade secret existed.  (D.E. 127, May 4, 2023 Op., at 5-8.)

[2]  When discovery, which did not include depositions, and the remaining pretrial proceedings concluded, a final pretrial order (the parties' second attempt at one) was entered.  (D.E. 146.)  The parties did not file any motions in limine, and indicated in the final pretrial order that they intended to raise any expert issues at trial through voir dire and live objections.  (*Id.* at 7-8.)

MTC called Jimmy Wang, MTC's CEO; Zhang Bo, a representative from Xi'an SaiNa Biological Technology Company; and Dr. Poguang Wang, offered as an expert in analytical chemistry.

Post trial, Jiaherb filed its proposed findings of fact ("Pl. FF") and conclusions of law ("Pl. CL") (D.E. 167), and MTC filed its proposed findings of fact ("Def. FF") and conclusions of law ("Def. CL") (D.E. 166).

### III.    Findings of Fact

Before setting forth the Court's narrative of the facts, it is important to note that there is no dispute about whether the parties had a contract (they did) and what the terms were, or what happened that led to this lawsuit, with one towering exception:  Jiaherb says that drums of saw palmetto oil it bought from MTC and resold to a customer were adulterated, and the adulterant was coconut oil, which MTC flatly denies.  As Jiaherb states in its Preliminary Statement to its post-trial proposed narrative statement of facts:  "The admissible evidence introduced at trial overwhelmingly support[s] Jiaherb's pre-trial proposed findings of fact."  (D.E. 167, at 1.) Jiaherb's pre-trial findings of fact, which are set forth in discrete paragraphs, are that its independent lab testing showed the presence of vegetable oils in the samples of the product at issue, and specifically that "[r]esults of the analysis show the presence of coconut oil while coconut oil should not have been present."  (D.E. 154 ¶¶ 38, 40-43.)

MTC frames the factual dispute as landing in one of two inquiries.  The Court could decide to concentrate on whether MTC fulfilled the letter of the parties' contract; or the Court could look to the larger picture and weigh the evidence Jiaherb presented on its testing results. From the Introduction to the post-trial proposed findings of fact MTC submitted:

> If the Court concludes that the contract only required MTC to supply Saw Palmetto Oil that contained fatty acids greater than 85% as determined by the GC method per USP 37,

all of Plaintiff's claims fail because that is what MTC supplied to Jiaherb.  If the Court goes beyond the terms of the contract and looks at the non-contractual tests relied upon by Plaintiff, all of Plaintiff's claims fail because Jiaherb did not prove adulteration by a preponderance of the evidence.

(D.E. 166, at 1.)

There was no pre-trial ruling that prevented Jiaherb from relying on its independent testing results to prove adulteration, and the Court focuses on what the parties focused on:  did Jiaherb prove, by a preponderance of the evidence, that MTC adulterated the saw palmetto oil that it sold Jiaherb with a cheaper vegetable oil, specifically coconut oil?

## A.  **The Parties**

Jiaherb manufactures and sells natural ingredients primarily used in dietary supplements. (T1[3] 12:3-14 [Chen].)  Jiaherb sources these raw ingredients from other manufacturers and sells them to its customers; these customers manufacture products from the ingredients to sell to everyday consumers in the marketplace.  (T1 12:18-13:2 [Chen].)  Jiaherb has been in this business for 16 years.  (T1 12:8-10 [Chen].)  Scott Chen, Jiaherb's president, has been working at the company since its inception and is in charge of the company's management and operation. (T1 11:8-18 [Chen].)  Jiaherb's quality control manager, Xiaohong Wang, oversees quality issues raised by Jiaherb's customers and has worked at the company for nine years.  (T1 177:23-178:4, 178:23-179:3 [X. Wang].)  When quality issues arise, she communicates with Jiaherb's in-house laboratories in China or third-party laboratories it does business with.  (T1 178:24-179:20 [X. Wang].)

---

[3]  "T1" refers to the trial transcript dated March 10, 2025; "T2" refers to the trial transcript dated March 14, 2025; "T3" refers to the trial transcript dated March 17, 2025; and "T4" refers to the trial transcript dated March 18, 2025.

MTC also manufactures and sells natural ingredients used in dietary supplements and has been in business for 31 years. (T3 417:22-23, 419:20-420:3 [J. Wang].) Originally, MTC was in the pharmaceutical industry. (T3 419:20-22 [J. Wang].) In the late 1990s it pivoted to the nutraceutical industry which was expanding rapidly and not highly regulated. (T3 419:20-421:2 [J. Wang].) In 2014, MTC hired Rodger Jonas as its vice president of sales and business development to pave its way into the nutraceutical business and into the United States' saw palmetto market. (T3 421:3-422:18 [J. Wang].)

**B.  Saw Palmetto**

Saw palmetto originates from the *serenoa repens* plant and primarily grows in the wild in Florida. (T1 121:19-22 [Chen]; Def. FF ¶ 1.) Once the saw palmetto berry is harvested for commercial purposes it may undergo extraction into an oil. (T3 466:2-467:3 [J. Wang].) Companies use extraction to enhance and concentrate the fatty acids normally found in the saw palmetto berry from 10% to approximately 85%. (T1 121:19-122:17 [Chen].) The oil is shipped to nutraceutical companies in barrels, or drums, for these companies to manufacture the product into dietary supplements for sale. (T3 486:12-25, 488:2-15 [J. Wang].)

**C.  The United States Pharmacopeia; Purity Standards for Dietary Supplements**

The United States Pharmacopeia ("USP") is an organization that publishes standards to determine the quality and purity of dietary supplements. (T2 301:9-304:7 [Kababick]; T3 467:23-468:19 [J. Wang].) These standards, also called "monographs," outline the testing methods and acceptable results that products must meet to be labeled USP-grade certified and considered authentic. (T2 301:11-302:21 [Kababick]; T4 609:5-610:6 [P. Wang].) Before labeling a product as USP-grade certified, companies must use these monographs to measure the testing results of their natural ingredients to USP-grade natural ingredients. (T2 303:18-23,

335:9-14 [Kababick].)  If the results are within the ranges that the USP establishes—which, for saw palmetto oil, provides specified percentages for ten qualified fatty acids and a ratio of lauric acid to individual fatty acids—the product is considered authentic, and may be advertised as being USP certified.  (T4 609:5-610:6 [P. Wang]; Def. FF ¶ 84.)

USP 37[4] requires manufacturers to use gas chromatography ("GC") testing to evaluate the purity of their saw palmetto extract oil.  (T1 150:2-5 [Chen], 198:22-24 [X. Wang].)  The parties agree that USP 37-grade saw palmetto extract requires the product to contain at least 85% total fatty acids, measured by GC.  (T1 17:21-24, 118:15-25 [Chen], 181:11-14 [X. Wang] (opining saw palmetto oil should have at least 80% fatty acids); T3 480:8-11 [J. Wang].)  Jiaherb's quality control manager Wang testified that GC testing is "a very good technique to separate the fatty acids" in saw palmetto oil in order to analyze the oil's "fatty acids components, the total content, and also each individual fatty acid[]."  (T1 181:2-7 [X. Wang].)  Further, GC testing is "a good technique to separate one oil from another because each oil may have a different fatty acids profile."  (T1 181:8-10 [X. Wang].)  GC testing ensures that the saw palmetto oil is sufficiently concentrated—meaning, it has 85% total fatty acids, and it is not adulterated with any other oil, which can be shown through the presence of other fatty acid profiles in the GC results.  [T1 185:23-187:7 [X. Wang].)

There is another, more sophisticated and expensive and relatively new method for detecting adulteration, nuclear magnetic resonance spectroscopy ("NMR").  (T2 304:8-306:19, 310:3-20, 405:15-406:8 [Kababick].)  NMR testing detects the presence of oils introduced

---

[4]  USP 37 was in effect at the time the product at issue was manufactured and is the grade represented in MTC's certificates of analysis.  (T2 397:25-398:14 [Kababick]; P37, P40, P47, P50.)  Consistent with USP 37, the parties contracted that MTC's saw palmetto oil would contain fatty acids not less than 85%, as confirmed by GC.  (T1 140:15-141:5 [Chen].)  This was the only quality, or purity, term contained in the contract.  (*Id.*)

through "sophisticated adulteration" that a less specific method like GC would not detect.  (T2 310:3-20, 405:15-406:8 [Kababick].)  According to Jiaherb's expert,

> historically gas chromatography was utilized for detecting adulteration with other oils.  But as people that were doing the adulteration became more sophisticated, they learned to mix oils or to fraction oils and bloom them at certain levels that would evade detection by gas chromatography.  But there are signatures of the -- with the NMR, you can see those signatures from those other constituents when they're put into saw palmetto.

> (T2 310:13-20 [Kababick].)

Notwithstanding, it remains industry standard for companies to use GC when testing their saw palmetto products for purchase and resale.  (T1 199:3-25, 201:5-12 [X. Wang]; T2 302:22-303:20, 364:2-16 [Kababick]; T3 480:8-11 [J. Wang].)  To date, the USP does not require the use of NMR testing before sale to the general public.  (T2 357:3-17 [Kababick].)  Nor does Jiaherb currently require NMR testing of its products before resale, due to the expense.  (T1 199:9-25 [X. Wang].)

Beyond the USP, the Food and Drug Administration ("FDA") has placed the onus on companies selling nutraceuticals to ensure that their products "are free from reasonably anticipated contaminates" through research and testing.  (T2 395:25-396:13 [Kababick].)  The FDA performs random audits on nutraceutical companies to check that the product being sold in the market meets the labeling the companies attach to it.  (T3 443:14-445:11 [J. Wang].)

### D.  **The Parties' Quality Control Procedures**

#### 1.  *MTC*

MTC began manufacturing and selling saw palmetto oil in 2016.  (T3 436:1-22, 447:17-448:12 [J. Wang].)  Before entering that market, CEO Jimmy Wang researched the health benefits of the saw palmetto berry.  (T3 422:9-18 [J. Wang].)  He learned that while the market demand at the time was high, supply was low because the United States had only one small

manufacturer of saw palmetto oil located in Florida.  (T3 422:9-423:6 [J. Wang].)  After

discussions with Rodger Jonas, MTC's vice president of sales and business development, and

trips to Florida during the berries' harvest season to familiarize himself with how the saw

palmetto berry is ground into a powder and then processed into an oil, Jimmy Wang began

looking for a facility that could extract saw palmetto oil from its powder form.  (T3 423:17-

427:16 [J. Wang].)  In 2015, MTC located a Chinese company, Xi'an SaiNa Biologic

Technology Company (the "vendor"), and signed an exclusivity agreement[5] with it to extract oil

from MTC's saw palmetto powder and supply that oil back to MTC.  (T3 430:8-431:18, 447:17-

448:8 [J. Wang], 576:13-20 [Bo].)  Thereafter, MTC began selling saw palmetto oil

commercially.  (T3 469:20-470:23, 476:19-477:13 [J. Wang].)

      MTC uses a four-step process for testing samples[6] of each batch of oil it sells.  (T3 448:6-

12, 450:19-454:2 [J. Wang]; Def. FF ¶ 13.)  First, the samples are tested at the vendor's in-house

lab.  (T3 450:23-451:6, 454:18-455:22 [J. Wang]; D8.)  Next, they are sent for GC testing at the

Eurofins Suzhou laboratory in China.  (T3 451:7-16, 456:8-458:4 [J. Wang]; D19.)  Then the

samples are tested by MTC in-house.  (T3 451:17-24 [J. Wang].)  MTC runs two types of

identification tests in-house:  FTIR, an infrared identification test, and HPTLC, a high-

performance thin-layer chromatography identification test.  (*Id.*, 488:16-489:3 [J. Wang].)  Last,

---

[5]  Before signing this exclusivity contract, MTC first "qualified" Xi'an SaiNa by assessing the facility's capabilities, sending random samples of the oil to a third-party testing facility for independent evaluation, and performing its own testing of the product.  (T3 432:8-436:11 [J. Wang].)  MTC determined Xi'an SaiNa to be qualified in early 2016.  (T3 436:4-11 [J. Wang].)

[6]  Prior to sealing the drum of saw palmetto oil, and during production of the oil, the vendor selects samples of each batch for testing purposes.  (T3 486:12-487:24 [J. Wang].)  These samples are sent to various laboratories and are eventually sent to MTC's customers—at no point does MTC break the seal of the drum of oil.  (T3 486:25-487:24 [J. Wang].)

the samples are sent to the National Safety Foundation laboratory and Tru-ID laboratory for DNA testing.  (T3 451:25-425:14, 458:6-462:20 [J. Wang]; D12, D13.)

At each stage, and once again after all tests are completed, MTC reviews the certificate of analysis ("COA") produced by each laboratory for each batch, and checks that the testing data meets USP ranges for saw palmetto oil.  (T3 467:23-469:16 [J. Wang].)  MTC then puts the COA certification data on its own COA to reflect the properties of the saw palmetto oil.  (T3 469:17-471:24 [J. Wang].)  MTC has received accreditations from various organizations certifying that its saw palmetto product meets certain standards and certifies on its website that each batch of saw palmetto oil has "more than 85 percent" fatty acids.  (T3 472:4-476:16 [J. Wang]; Def. FF ¶ 15; D28.)

After it gets a purchase order, MTC sends a pre-shipment sample of the product at the customer's request.  (T3 477:21-22, 479:5-9 [J. Wang].)  After testing the sample, a customer can ask for the product to be shipped or it can cancel the contract.  (T3 479:5-22 [J. Wang].)  If the sale goes through, MTC issues a commercial invoice and ships the batches.  (T3 480:23-484:23 [J. Wang].)  Along with the batches, MTC sends its customer the product's COA to reflect the properties of the saw palmetto oil.  (T3 486:2-8 [J. Wang].)

The batches of saw palmetto oil MTC sold Jiaherb underwent these quality control procedures.  (T3 453:15-462:19, 479:5-484:23 [J. Wang].)  MTC and the vendor maintain that they have not received any claims of adulteration from other customers.  (T3 578:8-20 [Bo]; Def. FF ¶ 23.)  Further, the FDA has found no issues with MTC's products during its random audits.  (T3 443:14-445:13 [J. Wang].)

*2. Jiaherb*

Jiaherb has a standard procedure for how it accepts products from its manufacturers and sells to customers. (T1 24:22-25:12, 35:11-15 [Chen].) First, Jiaherb sends a purchase order to the manufacturer for a certain amount of product. (T1 35:14-15 [Chen].) To ensure the product meets its quality standards, Jiaherb samples the product, performs in-house testing, and checks the manufacturer's COAs and accompanying documents. (T1 35:15-17, 134:2-15 [Chen], 180:8-18 [X. Wang].) From 2016 through 2018, Jiaherb's practice was to perform several tests on its samples, including GC fatty acid testing, potency testing, microbial testing, heavy metal testing, and pesticide testing. (T1 180:21-181:19 [X. Wang]; Pl. FF, at 7.)

Once the samples pass this testing, Jiaherb asks the manufacturer to ship the product. (T1 35:17-18 [Chen].) When the product arrives at Jiaherb's warehouse, its logistic team checks that the product is sealed and that the label and lot numbers match the COAs the manufacturer provided. (T1 35:19-23 [Chen].) Then the product is moved to a quarantine area, where samples are taken from the batches and shipped to an in-house laboratory in China for additional testing. (T1 35:24-36:4 [Chen].) After the testing results confirm the product's quality, it is moved to a storage area and shipped to customers. (T1 36:1-13 [Chen].)

Jiaherb's quality control manager Wang testified that the in-house testing results on the batches from MTC showed that "the total fatty acids" of the product met "the specification of their supplier's C of A" and also met "the USP standard" for saw palmetto oil. (T1 182:2-11 [X. Wang]; Pl. FF, at 12.) To date, Jiaherb still only uses GC to test its saw palmetto. (T1 199:9-25 [X. Wang].)

### E.  **Genesis of the Dispute**

Jiaherb began buying saw palmetto oil from MTC in 2016 after hearing it had "good quality of saw palmetto oil with [a] very competitive price."  (T1 13:19-21, 16:5-17:17 [Chen].)  After emailing with Rodger Jonas about the stock, price, quality, and specifications, Chen placed multiple purchase orders and requested samples of the product.  (T1 17:1-18:19, 130:15-24, 144:11-17 [Chen].)

Between November 2016 and December 2017, Jiaherb bought 17,266 kilograms (97 drums) of saw palmetto oil from MTC, with batch numbers 161006, 161022-2, 161220-1, 161220-2, 161112-2, and 170425.  (Def. FF ¶ 35; Pl. FF, at 8; J8, J9, J10, J11.)  Jiaherb's purchase orders laid out the requirements for the saw palmetto oil, including that it should contain "Fatty Acids 85% [by] GC," which Jiaherb would verify by third-party testing.  (T3 478:2-479:1 [J. Wang]; J8, J9, J10, J11.)  Jiaherb's purchase orders also requested a neutral label so it could resell the product without disclosing MTC's name.  (T1 41:2-42:10 [Chen]; T3 480:12-22 [J. Wang].)

MTC sent Jiaherb samples and accompanying COAs, which Jiaherb sent to its in-house laboratory in China for GC testing.  (T1 18:3-19, 21:7-22:13, 134:2-15, 144:6-21 [Chen]; P37, P40, P47, P50.)  MTC's COA for batches 161112-2 and 170425[7] identified the product as saw palmetto oil 85%, complying with USP 37.  (T1 135:2-17 [Chen]; P37, P47.)  After testing, the samples passed the 85% minimum fatty acids requirement consistent with Jiaherb's purchase order and MTC's COAs.  (T1 132:22-133:6, 144:18-145:19 [Chen].)  Jiaherb asked for the

---

[7]  It is undisputed that these are the batches at issue in this action.  (T1 127:16-128:15 [Chen]; P11.)  Between March and May 2017, MTC shipped approximately 8,188 kilograms of saw palmetto oil to Jiaherb from batch number 161112-2.  (T1 145:25-146:20 [Chen]; Def. FF ¶¶ 49-52; D1.)  And in December 2017, MTC shipped approximately 712 kilograms of saw palmetto oil to Jiaherb from batch number 170425.  (T1 128:1-4 [Chen]; Def. FF ¶ 54; D1.)

batches to be shipped and accepted the delivery of the product along with MTC's commercial invoices. (T1 145:16-146:20 [Chen].) According to these invoices, Jiaherb was responsible for confirming the quality and quantity of the product, and any discrepancies had to be "reported to MTC Industries within 7 days of receipt." (D1.) Jiaherb paid MTC and the saw palmetto oil was delivered between January 2017 and February 2018. (*Id.*)

Jiaherb began selling the product to its customers. (T1 146:15-23, 151:5-14 [Chen].) In April 2017, Factors Group[8] placed a large order with Jiaherb for 3,560 kilograms of saw palmetto oil and agreed to make a 10% deposit. (T1 151:5-154:2 [Chen]; P23.) But in August, Factors Group notified Jiaherb that it wanted to cancel part of its order because it forecasted a major change in business volume for saw palmetto. (T1 154:14-157:9 [Chen]; P33.) After a back and forth, Jiaherb accepted this cancelation. (T1 156:17-157:9 [Chen]; P33.)

Then in October 2017 Factors Group emailed Jiaherb that it wanted to cancel more of its order due to a quality issue. (T1 158:11-15 [Chen].) Factors Group stated that it hired Isura, a certification and testing lab in British Columbia, Canada, for quality testing; Isura used NMR testing. (T2 215:12-15, 216:23-217:1, 223:18-225:17 [Du].) The results, according to Factors Group, showed that Jiaherb's saw palmetto oil fell below the quality standards it was representing. (T1 160:14-161:8 [Chen]; T2 229:25-230:15 [Du]; J3.)

This was the first time a customer had complained to Jiaherb about a quality issue. (T1 51:20-52:15 [Chen].) Chen was surprised because Jiaherb had performed its own tests and determined the product met its quality standards. (T1 51:20-52:15 [Chen].) He and Xiaohong Wang "had never heard of NMR testing before on saw palmetto oil," which they found out was a

---

[8] Witnesses at trial used the names "Factors Group" and "Natural Factors" interchangeably to reference this customer. The Court will use "Factors Group." (*See* P33, P34.)

new and advanced way to test for potential saw palmetto oil adulteration.  (T1 52:12-53:19, 53:9-19 [Chen].)  Ultimately, Jiaherb accepted Factors Group's cancelation and ordered further testing on the unshipped batches.  (T1 53:11-19, 158:16-159:22 [Chen]; P27.)

Chen decided to send samples of the rejected saw palmetto oil, plus samples of the lots still in inventory, to two independent third-party laboratories for both NMR and GC testing.  (T1 53:17-19, 54:19-21 [Chen].)  Those laboratories were Isura—the lab that Factors Group used—and Eurofins laboratories ("Eurofins").  (T1 53:23-54:14 [Chen].)  Jiaherb directed Isura to perform NMR testing and Eurofins to perform additional GC testing on the samples.  (T1 53:23-54:14 [Chen].)  At that time, Isura was "the only lab [Jiaherb] kn[e]w [of] which can run the NMR testing on saw palmetto oil."  (T1 55:2-6 [Chen].)  And while Jiaherb had performed GC testing in-house before accepting delivery of MTC's product, it had not performed GC "free fatty acid" testing because it did not have that capability.  (T1 54:6-18 [Chen].)  But Eurofins did.  (T1 54:16-18 [Chen].)[9]

Min Du, a representative from Isura, testified about the lab's diagnostic processes for the testing and identification of natural health products, as well as its sample handling and chain of custody procedures.  (T2 215:10-15, 217:14-219:14, 224:9-226:3 [Du].)  When Isura received the samples from Jiaherb, it arranged for third-party testing since it did not "have the necessary instruments on site"; when it received the raw NMR data, Isura analyzed and interpreted it.  (T2 216:15-21, 223:18-24, 225:10-17 [Du].)

Isura's first report for Jiaherb, dated February 20, 2018, analyzed samples of saw palmetto oil from lots 161112-2, 1099105, 20171114-1, 20171114-2, and 20171114-3, and

---

[9]  Jiaherb did not call a representative from Eurofins to testify, nor did it offer the Eurofins report until Kababick testified about it, *see infra*.

compared the raw data of those samples against a reference sample of coconut oil.[10] (T2 227:3-22, 232:20-233:11, 234:16-20 [Du]; P1.) The February report concluded that lot 161112-2 "contain[s] very high concentrations of triacylglycerols, possibly sourced from coconut oil," but that the other lots either had no adulteration or had inconclusive results. (T2 253:6-255:5 [Du]; P1.) Isura issued a COA for lot 161112-2, which "shows Isura's determination of the test results of this sample using NMR." (T2 234:24-235:13 [Du]; P3.) Isura found that the samples failed, as they did not match the reference data for pure saw palmetto oil. (T2 236:2-7 [Du]; P3.)

On March 2, 2018, Chen emailed Rodger Jonas of MTC that Jiaherb "found adulteration in the saw palmetto oil" and intended to return 2,847.5 kilograms—roughly $385,000—worth of unsold product from batches 161112-2 and 170425 and get its money back. (T1 57:8-21, 59:19-60:7, 127:16-128:25 [Chen]; T3 506:14-507:7 [J. Wang]; P11.) Chen also complained that some of the product had become flocculated.[11] (D6.) He attached the Isura and Eurofins reports to his email. (T1 60:14-20 [Chen].) MTC reviewed the reports, sent them to its vendor, and conducted an internal investigation. (T3 496:2-498:23 [J. Wang].) Within a week, MTC's quality control manager wrote an internal report, dated March 8, 2018, which concluded that the Isura NMR report suffered from multiple flaws and MTC would not accept its conclusions. (T3 499:3-11, 501:8-15 [J. Wang]; D4, D6.)

---

[10] Du clarified why only coconut oil was chosen as a reference: Isura's August 2017 NMR report—prepared for Factors Group—compared the saw palmetto oil samples against various other edible oils, but only coconut oil was found to be a similar match. (T2 244:2-246:18 [Du]; J3.) That report concluded that it was "likely" that the oil tested had been adulterated by either the addition of coconut oil or a similar oil. (T2 248:24-249:18 [Du]; J3.)

[11] Flocculation, or separation of the product, occurs if saw palmetto oil is stored below 20 degrees Celsius. (T3 502:8-25, 505:3-18 [J. Wang].)

MTC emailed that report to Jiaherb.  (T3 499:3-11 [J. Wang].)  In the accompanying email, MTC disputed that its product was adulterated and rejected Jiaherb's demand for repayment.  (T3 503:7-21 [J. Wang]; T1 61:10-14 [Chen]; D4, D5, D6.)  It claimed that Jiaherb was its only complaining customer, and that Jiaherb "had the product far beyond the time that would be acceptable for a rejection."  (T1 61:12-14 [Chen]; D5, D6.)  MTC hypothesized that the NMR data could be due to a temperature issue related to how Jiaherb was storing the product.  (D5, D6.)  MTC also took issue with the suitability of NMR to test saw palmetto oil.  (T1 61:12-14 [Chen]; D4, D5, D6.)  In response, Jiaherb offered MTC the opportunity to come to its warehouse to sample the product; MTC declined.  (T1 61:15-63:8 [Chen]; T3 528:19-529:13 [J. Wang]; D6.)  After that, Jiaherb retained counsel.  (T1 63:7-11, 65:15-66:8 [Chen].)

In June 2018, after Jiaherb sought additional NMR testing, Isura issued a second report.  (T2 236:8-237:16 [Du]; J1.)  This one analyzed samples of saw palmetto oil from lots 161022-2, 161006, 161220-1, 161220-2, and 170425, and compared the raw data of those samples against a reference of pure saw palmetto and a reference sample of coconut oil.  (T2 237:9-19 [Du].)  The report did not test batch 161112-2.  (T2 255:13-17 [Du].)  Isura concluded that the NMR data of the samples revealed similarities to data of saw palmetto oil mixed with coconut oil, but did not conclude definitively that the samples were mixed with coconut oil.  (T2 255:18-256:3 [Du].)  It is this report that the parties' respective experts focused on.

### F.  **The Experts' Competing Positions on the June Isura Report**

James Kababick, Jiaherb's expert, was qualified as an expert on adulterants in the dietary supplement industry, while Dr. Poguang Wang, MTC's expert, was qualified as an expert in analytical chemistry.  (T2 343:3-344:9 [Kababick], T4 608:8-13, 686:8-689:20 [P. Wang].)

Kababick is the director of Flora Research Laboratories in Grants Pass, Oregon and has specific experience in dietary supplement quality control and adulteration. (T2 272:20-273:21 [Kababick].) He testified about his interpretation of the NMR testing data in the June 2018 Isura report. (T2 313:5-314:3, 334:24-335:21 [Kababick].) Dr. Wang, who testified in rebuttal, was a principal research scientist in chemistry and pharmaceutical sciences at Northeastern University. (T4 590:1-592:4 [P. Wang].) He has specific experience in conducting NMR and GC tests and is familiar with analyzing data from these testing methods. (T4 591:2-592:4, 608:3-13 [P. Wang].)

Kababick testified that NMR testing produces "spectra" data, which can reveal "anomalies or resonances" when compared to the spectra data of a reference sample. (T2 311:15-24 [Kababick].)

> [T]he spectra is a line, and then at different places on the spectra you see resonances. So you see these clusters of bands or peaks. And those can be assigned to aspects of -- if you're doing like a single chemical, to aspects of different parts of the molecule. Or they can be assigned to compounds. Like we could say this resonance represents tri-iso glycerol signature. Or this resonance represents, you know, a proton next to a chlorine atom. So there's a lot of information you can gather from the spectral data.

(T2 312:10-19 [Kababick].) He concluded that the samples' spectra data "shows distinct resonances that are out of proportion and out of the range they should be for the authentic saw palmetto oil, and those resonances are very characteristic of medium chain triglycerides, mainly coconut oil." (T2 312:23-314:3, 331:21-332:6 [Kababick].) In other words, the samples' spectra data showed several peaks where authentic saw palmetto oil does not have peaks, which could be explained by the addition of coconut oil. (T2 313:24-314:3, 326:3-23 [Kababick].)

According to Kababick, a "simple visual inspection of the spectral data" in the Isura report was sufficient. (T2 338:18-20 [Kababick]; Pl. FF, at 36.) As to Isura's conclusions, Kababick "didn't have any concerns" about the report or its methodologies. (T2 331:21-332:19

16

[Kababick].)  Kababick also considered the Eurofins report[12] and found the data there further supported Isura's NMR findings.  (T2 334:24-337:8 [Kababick].)  Specifically, he testified that several of the samples' chemical ratios were out of the range that the USP establishes, "which indicates adulteration with another vegetable [oil] source."  (T2 335:6-336:7 [Kababick].)

Dr. Wang rejected the methodology and conclusions in the Isura and Eurofins reports. Contrary to Kababick, Dr. Wang opined that the NMR spectra could not merely be visually inspected.  (T4 614:25-616:8 [P. Wang].)  Rather, the results should have been compared to a scientifically acceptable reference to see if there was coconut oil adulteration present.  (*Id.*)  Dr. Wang noted that Isura did not provide the digital file of the test results, just the visual spectra, which, as he later went on to explain, obfuscates how Kababick reached his conclusions and the shortcomings of his methodology.  (T4 626:17-627:6, 633:19-25, 635:18-22 [P. Wang].)

---

[12]  The Court permitted Kababick to testify on this data pursuant to Fed. R. Evid. 703 and Kababick's representations that experts commonly rely on such reports in making adulteration determinations.  (T2 314:18-323:1 [Kababick].)

Fed. R. Evid. 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

While Kababick may rely on the data contained in the Eurofins report as informing his expert opinion, the Court will not evaluate or weigh the report itself as it is not in evidence.  *See Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (Ackerman, J.) ("[A]n expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony.").

In his analysis, Dr. Wang looked to Figures 1 and 2 of the Isura report and compared the data points to a scientifically acceptable reference.[13]  (T4 614:25-639:3 [P. Wang].)



**Figure 1.** ¹H NMR spectra of various Saw palmetto oils. Expansion showing 5.7 to 3.5 ppm region. * indicates region where differences are observed. Ex. J-1.

(J1, at JIA000087.)

---



**Figure 2.** ¹H NMR spectra of various Saw palmetto oils. Expansion showing 3.0 to 0.5 ppm region. * indicates region where differences are observed. *See,* J-1.

(J1, at JIA000088.)

**Table 1**
¹H NMR spectra signal assignments.

| Peak | δ (ppm) | Assignment | |
|---|---|---|---|
| | | Proton | Compound |
| 1 | 7.26 | CHCl₃ | Chloroform (solvent) |
| 2 | 5.36 | CH = CH (f) | All unsaturated fatty acids |
| 3 | 5.27 | CHOCOR (β) | Glycerol (triacylglycerols) |
| 4 | 5.08 | CHOCOR (β) | Glycerol (sn-1,2-diacylglycerols) |
| 5/6 | 4.30/4.15 | CH₂OCOR (α) | Glycerol (all acylglycerols) |
| 7 | 4.07 | CHOH (β) | Glycerol (sn-1,3-diacylglycerols) |
| 8 | 3.93 | CHOH (β) | Glycerol (monoacylglycerols) |
| 9 | 3.73 | CH₂OH (α') | Glycerol (sn-1,2-diacylglycerols) |
| 10 | 3.64 | CH₂OH (d) | Fatty alcools |
| 11/12 | 3.70/3.60 | CH₂OH (α') | Glycerol (monoacylglycerols) |
| 13 | 2.81 | CH = CHCH₂CH = CH (g) | Linoleyl and linolenyl |
| 14 | 2.44 | CHOH | Glycerol (monoacylglycerols and sn-1,2-diacylglycerols) |
| 15 | 2.35 | CH₂COOH (d) | All acyl chains |
| 16 | 2.06 | CH₂CH = CH (e) | All unsaturated fatty acids |
| 17 | 1.97 | CH₂OH | Glycerol (monoacylglycerols and sn-1,3-diacylglycerols) |
| 18 | 1.64 | CH₂CH₂COOH (c) | All acyl chains |
| 19 | 1.56 | CH₂CH₂OH (c) | Fatty alcools |
| 20 | 1.26 | (CH₂)ₙ (b) | All acyl chains |
| 21 | 0.97 | CH = CHCH₂CH₃ (a') | Linolenyl |
| 22 | 0.89 | CH₂CH₂CH₂CH₃ (a) | All acids except linolenyl |

(D35.)

Using blow-ups of Figures 1 and 2, Dr. Wang opined that peak 2 of Figure 1 at 5.36ppm on the horizontal axis, which measured "all unsaturated fatty acids" of the samples, showed that

the coconut oil reference had no unsaturated fatty acids present, while the samples showed a peak in their unsaturated fatty acids consistent with the saw palmetto oil reference. (T4 617:25-621:19 [P. Wang].) He opined that if coconut oil truly diluted the samples, their spectra would reflect fewer, not more, unsaturated fatty acids at peak 2. (T4 620:5-20, 630:5-12 [P. Wang].)

Next, Dr. Wang considered peak 3 at 5.27ppm, which measured "glycerides." (T4 622:8-16 [P. Wang].) It was Kababick's opinion that this resonance was significant since it is "not found in saw palmetto [but] [is] known to occur with coconut oil." (T2 331:21-332:13, 338:18-20 [Kababick].) However, after a close visual inspection, Dr. Wang concluded that the samples' reference peaks were in fact on a different plane, or position, than the coconut oil reference— they were shifted to the left. (T4 622:8-625:16 [P. Wang].) He opined that this shift would be viewable in a digital file of the data, which Isura did not provide, and Isura was attempting to "lead" the eye to view the samples' resonances on the same plane as the coconut reference by placing asterisk marks above them, which is not a common practice. (T4 625:5-626:18, 633:19-635:22 [P. Wang].) He testified that the NMR instrument has "resolution specs" which produces accurate results to a decimal point, so a shift such as this one is "significant." (T4 625:15-626:9, 634:16-18 [P. Wang].) This shift led Dr. Wang to conclude that there were "two different protons or two different species" besides coconut oil that were responsible for the spectra spike. (T4 626:5-10 [P. Wang].)

As well, Dr. Wang testified that peaks 5/6 at 4.30/4.15ppm, which showed the samples had the most significant peaks in "all glycerides" when compared to the reference saw palmetto oil, suffered from a plotting defect. (T4 621:24-622:7, 628:22-629:17 [P. Wang].) He pointed out that the peaks showed on the reference coconut oil were "chop[ped] off" by the top of the chart, leaving no way to know the true height of the peak, or how intense the signal was. (T4

613:20-22, 628:22-629:17, 630:24-631:10 [P. Wang].)  He testified that it is not a normal practice to cut off the top of a comparator chart, and questioned Isura's rationale for doing so. (T4 629:4-18 [P. Wang].)

As for Figure 2 of the Isura report, Dr. Wang opined that peak 16 of the samples at 2.06ppm, which measured "all unsaturated fatty acids," should have less intensity if they were adulterated with coconut oil, since the coconut oil reference had no presence at peak 16 while the saw palmetto oil reference did.  (T4 632:9-21 [P. Wang].)  But the report shows that was not the case; the samples' peaks closely mirror the reference saw palmetto oil peaks.  (T4 632:9-21, 633:10-18 [P. Wang].)

Dr. Wang also criticized the Eurofins report, noting that Eurofins did not use USP protocol in its GC analysis; instead, it used an undisclosed "internal method." (T4 639:14-641:16, 642:17-645:9 [P. Wang].)  This meant that he could not verify the conclusions of the report or confirm that Eurofins complied with the requirements of USP 37.  (T4 641:8-642:11, 645:10-13 [P. Wang].)

G. **Summarizing the Testimony**

*1. What is Not in Dispute*

Both sides agree that one of Jiaherb's customers, relying on test results using the NMR method, cancelled part of its order for saw palmetto oil.  The customer complained of a quality issue, and MTC sold Jiaherb the offending product.  NMR testing, which detects adulterants introduced through "sophisticated" means, is relatively new, expensive, and is not required in the industry.  Jiaherb and MTC's contract called for GC testing, which the offending product had passed.  And the United States Pharmacopeia quality standards for saw palmetto oil only require GC testing, not NMR testing.

MTC's evidence that the customer's complaint was the first and only time its saw palmetto quality had been challenged was undisputed.  Also undisputed is that Jiaherb didn't know about NMR testing until the customer complained; that the June 2018 report from a testing lab, Isura, is the basis of Jiaherb's adulteration claim; that Jiaherb commissioned the Isura report after MTC disputed Jiaherb's claim of adulteration by coconut oil; and that Isura's report interprets the raw data from NMR testing to show the presence of adulterating, cheaper coconut oil in the samples from the saw palmetto oil MTC sold to Jiaherb.

### 2.   *What Is in Dispute:  Expert vs. Expert*

The experts' opinions about whether the June 2018 Isura report reliably shows coconut oil is present in the samples are the heart of the case.  Jiaherb prevails if its evidence, offered through the expert opinion of James Kababick, shows by a preponderance that coconut oil is present in the samples Isura tested.  Jiaherb has not met its burden if MTC's rebuttal expert Dr. Wang pokes enough holes in Kababick's testimony to sink it as sufficiently probative.

Evaluating the experts, the Court finds Kababick to be a useful witness for background purposes.  About adulteration in the industry, he testified:

> Saw palmetto only grows in the southeastern United States; so the crop region is limited . . . .  It is also subject to challenges:  when we have hurricanes and other weather catastrophes, such as Katrina, which decimated the crop.  Saw palmetto consistently is a top-selling product in high demand and continues to expand in demand.  And that demand outstrips the supply.  So there is a high demand to meet product requirements for companies that manufacture.  And some companies will adulterate product to meet that demand, so they will dilute their product[.]
>
> . . . .
>
> The other reason is what we call economically motivated adulteration, which is akin to putting water in whisky and selling it; you get more money. . . .  Coconut oil, medium-chain triglycerides, are very inexpensive, very available.  And materials like that can be used to dilute a high-dollar saw palmetto oil.

(T2 293:25-294:18 [Kababick].)

He described how nuclear magnetic resonance works, and why it is effective:

NMR is very unique technology.  Because if you think of all of our tests as giving a facet, a view -- so if we think of our sample as . . . a cut diamond, each test we conduct we're looking at one facet. . . .  But we don't see the whole diamond. When you do proton NMR, because hydrogens and all molecules and atoms, the NMR can see everything.  It can even see water, solvents, all kinds of additives. So it essentially sees everything that goes in the solution.  And that makes it an incredibly powerful and unique technology.

(T2 305:16-25 [Kababick].)

He explained what he did, making it clear that he based his conclusions on the data from

the June 2018 Isura report[14]:

I reviewed the report in the entirety, and then I examined spectral profiles of the various materials under test and the references they used.  I then compared that, also, to literature data regarding spectra and resonances found in saw palmetto -- a lot of those have been worked out and assigned already -- and looked for things that indicated a difference; and then what those differences were correlated to.  In this case, the differences correlated to tri-iso glycerols.

. . . .

My conclusions were that the data showed that the samples in question were adulterated.

. . . .

The data shows distinct resonances that are out of proportion and out of the range tha[n] they should be for the authentic saw palmetto oil, and those resonances are very characteristic of medium chain triglycerides, mainly coconut oil.

(T2 313:9-314:3 [Kababick].)

---

[14]  On cross-examination, Kababick confirmed that he "relied upon the June 2018 Isura test to support [his] view that the tested samples of saw palmetto oil were adulterated."  (T2 375:2-5 [Kababick].)

As to the spectral profiles Kababick was confident about two things:  first, anomalies in the samples were visible to the naked eye.[15]  (T2 338:18-20 [Kababick] ("[T]his is a great example of a technique where simple visual inspection of the spectral data for proton NMR is ample."), 326:19-23 [Kababick] ("So seeing these very strong peaks, what sometimes is referred to as the goalpost because of the profile they form, really is characteristic of adulteration.  It's just, I have never seen a saw palmetto oil NMR that was authentic that looked like that.").)  And second, Kababick was satisfied with the accuracy of the Isura report in full.  (T2 342:18-19 [Kababick] ("I have high confidence of the Isura laboratory data."), 332:10-13 [Kababick] ("The report was pretty clear, to me, so I didn't have any concerns.").)  On direct:

Q.  Is there any reason to doubt the accuracy of the NMR report?

A.  No.

(T2 342:23-25 [Kababick].)

Dr. Wang, unlike Kababick, attacked head-on the report's accuracy.  As described above, he went point by point *through the visual data* (that Kababick found so compelling) and identified irregularities that Kababick overlooked or failed to explain.  He criticized the design of the report:

> They used a very simple experimental design, [it] just use[d] one single coconut oil as a reference, and then one particular saw palmetto sample as a reference.  So, basically, the design, ask[s] a viewer to look, based upon these two specific reference[s], to draw a conclusion that the MTC product is somehow contaminated by the first mentioned coconut oil.

---

[15]  The Court double checked Kababick's testimony regarding this point:

> The Court:  I'm relying on my memory of your saying, I didn't need to do anything else; I saw what I saw.  Right?

> Witness:  Yes.

(T2 340:15-18 [Kababick].)

(T4 611:11-17 [P. Wang].)

Following that observation, Dr. Wang offered three criticisms of the Isura report that effectively rebut Kababick's endorsement of it. First, Dr. Wang noted that Isura offers no digital information to back up the visuals in the figures. (T4 635:18-19 [P. Wang] ("[If] I have a digital file, I know where [the] peak is.").) The true peak determinations exist in the digital file: the peaks "[can all be found] in digital form. So you can read it from their data file. You don't have to spend effort to see, okay, this peak versus this peak is at a different position. They have a digital file, easy." (T4 626:17-21 [P. Wang].)

Second, by drawing a straight vertical line through the peaks on the blow-up of Figure 1, Dr. Wang demonstrated they were not matching up as Kababick assumed. (T4 634:7-11 [P. Wang] ("So because I have no digital file, so I manually add a line along th[ese] questionable peaks. Okay? They are now aligned by the same line. So, now, can anybody tell me, this one is the same as this marked peak? I say no.").)

Further, he challenged as misleading the asterisks that appear throughout the figures.

So I want you to take a closer look. Look at the way, look at the way to mark these peaks. When it's far away, they put the [asterisk] mark on top of the peak. When it's close to the reference, you see it's moved a little bit. It's off. So you don't see the deviation. So this is purposely done. And then this is purposely done. And then that's against common scientific practice.

(T4 634:19-635:1 [P. Wang].)

Dr. Wang confirmed the Court's understanding of his testimony on this point:

The Court: So you're saying that these asterisks are not really there to mark anything, other than to train the eye to appear as if they are similar . . . to lead the eye. Is that the idea?

The Witness: Yes. You said it very clearly. Yeah.

(T4 635:10-15 [P. Wang].)

Finally, Dr. Wang testified at some length about a shortcoming in NMR testing done here – the absence of principal component analysis ("PCA").  He strenuously objected to Jiaherb's position that the literature supports NMR "as the most reliable method to identify the composition of saw palmetto oil."  (T4 657:22-23 [P. Wang].)  He testified:

> A.  You forgot the keyword.
>
> Q.  What is the keyword?
>
> A.  PCA. . . .  PCA is like our approach with drawing this auxiliary line.  So instead of looking at the single one PPM, so we actually look around.  These peaks indeed are different.
>
> (T4 658:1-15 [P. Wang].)

According to Dr. Wang, PCA goes hand-in-hand with NMR testing.  "[W]hen PCA performed the job, PCA, we . . . analyze every pixel, every intensity.  And then, so PCA sometimes is called unsupervised machine learning or clustering study. . . .  Clustering.  Or correlation analysis."  (T4 658:16-21 [P. Wang].)  This challenge to the Isura report, while unexplored after Dr. Wang brought it up, underscores how Isura's principal findings are cabined into eye-catching Figures 1 and 2.[16]  More than once, Dr. Wang pointed out that Isura used "a high-resolution NMR machine" that is "good enough to resolve different features," can "integrate," and is able to produce resolution specs "to a decimal point."  (T4 625:13-626:4,

---

[16]  There are two additional figures—Figures 3 and 4—in the Isura report that Kababick briefly discusses in the same manner as Figures 1 and 2, i.e., that the samples' peaks, when compared to the reference coconut oil's peaks, demonstrate the presence of coconut oil in the samples.  (T2 328:14-330:10 [Kababick]; J1.)  Although Dr. Wang only specifically attacked Figures 1 and 2 with his blow-ups, his criticisms of those figures apply to Figures 3 and 4 in the same manner.  That is, Figures 3 and 4 lack a digital file, employ asterisks, and chop off the top of the reference coconut oil's peaks.

634:16-17, 635:20 [P Wang].)  Yet all that Jiaherb offered by way of evidence were visual charts.

The Court has noted that Kababick fully accepted the Isura report as accurate in design and findings.  Little if anything in his testimony refutes Dr. Wang's conclusions about Isura's methodology.  Moreover, it cannot be overlooked that Isura wrote the report because Jiaherb was looking for confirmation that MTC had introduced coconut oil into its product.  The danger of confirmation bias came up during the trial when the Isura representative Min Du was cross-examined.  (T2 251:21-252:6 [Du].)  The witness rejected the notion, but Dr. Wang's testimony more than suggests that Isura examined the NMR results looking for coconut oil and finding it.

Jiaherb's case rests on the Isura report.  The Court finds that its limitations, as identified by MTC's expert Dr. Wang, are such that Jiaherb has not proven by a preponderance that the samples of saw palmetto oil Jiaherb bought were adulterated with coconut oil.  As argued by MTC and discussed next, this finding dooms Jiaherb's claims against MTC.

## IV.    Conclusions of Law[17]

### A.  Lanham Act Claim (Count One)

The Lanham Act provides a cause of action for "the deceptive and misleading use of marks" by businesses "to protect persons engaged in such commerce against unfair competition . . . ."  15 U.S.C. § 1127.  Critically, although "end consumers also benefit from the Act's proper enforcement, the cause of action is for *competitors, not consumers*."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) (emphasis added); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014).

---

[17]  This Court has subject matter jurisdiction over Jiaherb's Lanham Act claim under 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over Jiaherb's state law claims under 28 U.S.C. § 1367(a).

Under Section 43(a) of the Lanham Act:

> (a)(1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any . . . false or misleading description of fact, or false or misleading representation of fact, which--
>
> . . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To have standing to sue, a plaintiff must (1) "fall within the zone of interests protected by the law invoked" and (2) demonstrate that its injuries were proximately caused by a violation of the Act. *Lexmark*, 572 U.S. at 129-34 (citation omitted). To satisfy the first element, a plaintiff bringing a false advertising claim "must allege an injury to a commercial interest in reputation or sales." *Id.* at 131-32. To satisfy the second, the plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

Within its discussion of what kind of commercial interests satisfy the standing requirement, *Lexmark* articulated that consumers who are "hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but . . . cannot invoke the protection of the Lanham Act." *Id.* at 132. And "[e]ven a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis." *Id.*

*POM Wonderful* illustrates a relationship qualifying for standing. There, POM, a distributor of pomegranate juices, sued Coca-Cola, which at that time was selling a "pomegranate blueberry" juice containing 99.4% apple and grape juices, 0.3% pomegranate juice, 0.2% blueberry juice, and 0.1% raspberry juice. *POM Wonderful*, 573 U.S. at 109-10. POM claimed that Coca-Cola's label "tricks and deceives consumers, all to POM's injury as a competitor" since those consumers might pick Coca-Cola's apple juice—misleadingly labeled as pomegranate juice—over POM's pomegranate juice. *Id.* at 110. The primary issue was preemption, but the Supreme Court stressed that POM's injury stemmed from the companies' competitive relationship, as "the Lanham Act protects commercial interests against unfair competition." *Id.* at 115-21. The Court ultimately found that "[c]ompetitors, in their own interest, may bring Lanham Act claims like POM's that challenge food and beverage labels that are regulated by the [Federal Food, Drug, and Cosmetic Act] FDCA." *Id.* at 106.

As noted earlier, Jiaherb's Lanham Act claim was dismissed as originally pled because the alleged injury

> [did] not stem from MTC's false advertising or conduct by MTC which unfairly diminished Jiaherb's competitive position in the marketplace. ***Rather, Jiaherb is harmed as a consumer of MTC's product; Jiaherb's lost profits and goodwill stem from its purchase of a product which it cannot sell***. The injury of a consumer-entity that was misled into purchasing a "disappointing product" is precisely the type that the *Lexmark* Court excluded from Lanham Act relief. As a result, the Court is constrained to find that Jiaherb has failed to establish it has statutory standing to bring a claim under the Lanham Act.

(D.E. 41, Mot. to Dismiss Op., at 8 (emphasis added).) Jiaherb was permitted to amend the claim if it could sufficiently plead a competitive relationship with MTC and that it suffered "an injury to a commercial interest in reputation or sales" sufficient to confer it statutory standing. (*Id.* at 5, 7-8.) It did so, and that amended claim was permitted to proceed past the pleadings stage. (D.E. 83, Mot. to Amend Op., at 4.)

At trial, however, a plaintiff cannot rely simply on factual allegations to succeed on its claims, it must prove its claims by a preponderance of the evidence, and Jiaherb did not offer evidence that it was harmed by MTC's marketing and selling of its saw palmetto oil as to diminish Jiaherb's competitive position in the marketplace.  Instead, Jiaherb's evidence was directed to its theory that MTC falsely advertised the quality of its saw palmetto oil to Jiaherb *itself*, causing Jiaherb to lose profits (as it declined to sell the remaining oil in stock it deemed unpure) and customer goodwill.  Jiaherb's president Scott Chen testified that the parties had a "regular business relationship as seller and buyer."  (T1 13:15-14:2 [Chen].)  Jiaherb, the customer, would purchase the saw palmetto oil from MTC and sell it under its own label directly to customers to prevent them from "find[ing] out we are buying from [MTC]."  (T1 41:2-42:10 [Chen]; T3 480:12-22 [J. Wang].)  Nowhere at trial did Jiaherb allege how it was harmed by virtue of unfair competition, or that MTC was selling its saw palmetto oil to the same consumers as Jiaherb.  Jiaherb's proofs and theory of its case were directed to its alleged harm in its consumer capacity, for which it cannot recover under Section 43(a).

Even if Jiaherb had supported the requisite competitor relationship with evidence, its claim still fails because it has not shown that MTC made false statements about its product or that customers are likely to be deceived by MTC's representations.  A Section 43(a) claim requires proof of the following elements:

> 1) that the defendant has made false or misleading statements as to his own product . . . ; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000).  As to the first element, the defendant's statement must be "(1) literally false[,] or (2) literally true or

ambiguous, but [having] the tendency to deceive consumers." *CareDx, Inc. v. Natera, Inc.*, 2024 WL 4441418, at *2 (3d Cir. Oct. 8, 2024). As to the second element of the five-factor test, if the defendant's statements are literally true or ambiguous "the plaintiff must prove actual deception or a tendency to deceive, and it may do so with a properly conducted consumer survey." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

Jiaherb targeted as literally false MTC's statement that its saw palmetto oil contains "Fatty Acids 85% GC." Its key evidence of falsity was the NMR testing it commissioned after Factors Group complained. (T2 312:23-314:3, 331:21-332:6 [Kababick]; J1.) Other evidence showed, however, that GC testing, not NMR testing, is the industry standard for saw palmetto oil, and that MTC's saw palmetto oil *did* contain 85% fatty acids when measured using GC. (T1 148:19-150:13 [Chen], 181:11-14, 182:2-11 [X. Wang]; T3 480:8-11 [J. Wang].)

Jiaherb concedes that GC is industry standard—both now and during the timeframe covering the shipments at issue—but that it is not the most "sophisticated" method. (T1 198:22-199:25 [X. Wang]; T2 309:21-310:20, 355:2-357:17, 364:13-16 [Kababick].) However, Jiaherb offered no evidence that buyers of saw palmetto oil expect NMR—again, not the industry standard methodology—to be used to pick up potential impurities missed by GC; in other words, it failed to show that anyone would be deceived by this alleged falsity. Indeed, Jiaherb itself uses GC to test the saw palmetto oil it sells to its customers because NMR testing is "very expensive." (T1 199:9-25 [X. Wang].) Jiaherb has therefore not proven by a preponderance of the evidence that MTC's statements were false or that its customers were likely to be deceived by MTC's representations, and the claim must fail.

## B. **State Law Claims**[18]

### 1. *Fraudulent Inducement (Count Two)*

To prevail on a claim for fraudulent inducement, a plaintiff must establish "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *RNS Sys. Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (Simandle, C.J.). The material representation must be shown by clear and convincing evidence. *CDK Global, LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 304 (D.N.J. 2020) (McNulty, J.) (citation and quotation marks omitted). And when an alleged fraud is based on material misrepresentations or false statements, it is not enough for the plaintiff "to merely allege that defendants knew or must have known that their statements were false." *See Rainforest Distrib. Corp. v. Vybes L.A. LLC*, 2021 WL 3879099, at *10 (D.N.J. Aug. 31, 2021) (Martinotti, J.) (quoting *In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004)). The plaintiff must instead show, "by whatever means[,] that defendants did not have an honest belief in the truth of their statements." *In re Great Atl.*, 103 F. App'x at 470 (citation omitted).

Here, Jiaherb alleges that MTC misrepresented the quality of its saw palmetto oil in the parties' contract. But Jiaherb has not met its burden to prove that MTC's statement that its saw palmetto oil contains "Fatty Acids 85% GC" was a material misrepresentation. And Jiaherb has offered no evidence that MTC had *knowledge* that its representations regarding its saw palmetto oil were false. MTC's CEO Jimmy Wang testified to just the opposite, that MTC's product went through multiple levels of testing and did not contain coconut oil—or any other foreign

---

[18] It is undisputed that state law applies to the remaining claims.

substances—when it was sold to Jiaherb.  (T3 453:15-454:2, 454:18-462:19, 515:20-516:15 [J. Wang].)  Finally, Jiaherb did not offer evidence that MTC made pre-contractual misrepresentations which induced Jiaherb to enter into the contract.  Scott Chen testified he heard that MTC had "good quality saw palmetto oil with [a] very competitive price" and went ahead on that basis.  (T1 16:3-17 [Chen].)  Based on these deficiencies, this claim must fail.

### 2. Breach of Contract (Count Three)

Under New Jersey law, "[t]o establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result."  *Peck v. Donovan*, 565 F. App'x 66, 69-70 (3d Cir. 2012) (quoting *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007)).

Jiaherb's purchase orders—the operative contracts—require MTC's saw palmetto oil to contain "Fatty Acids 85% GC."  (J8, J9, J10, J11.)  This terminology means that the product must contain at least 85% fatty acids *as determined by the GC testing method*.  (T1 140:11-141:5 [Chen], 198:22-200:5, 203:24-204:2 [X. Wang].)  That is what Jiaherb received; there was no breach.

Jiaherb argues that even if the product passed GC testing, no added substances are allowed under USP 37—which MTC represented as its saw palmetto grade in its COAs (T2 397:25-398:14 [Kababick]; P37, P47)—and that the Isura report and Kababick's testimony about it demonstrate that MTC's saw palmetto oil contained coconut oil.  As noted, Dr. Wang pointed out the report's plotting defects and misleading asterisks (T4 613:20-22, 622:8-625:16, 628:22-629:17, 630:24-631:10, 634:19-635:15 [P. Wang]); incompleteness, as Isura did not provide a digital file of the data (T4 625:5-626:18, 633:19-635:22 [P. Wang]) or run a principal component

analysis (T4 657:22-658:21 [P. Wang]); and failure to account for other obvious scenarios, since the samples were only compared to a single coconut oil reference (T4 611:11-17, 626:5-10 [P. Wang]).  Based on his interpretation of the data and the absence of corroborating digital information, Dr. Wang concluded that coconut oil was not demonstrably present in the samples. (T4 625:5-627:22, 629:2-635:23 [P. Wang].)  Jiaherb has the burden of showing just the opposite by a preponderance, and Dr. Wang persuasively rebutted its evidence.[19]

Jiaherb suggests in its post-trial submission that it was up to Dr. Wang to "provide [a] coherent alternative explanation" for the peaks in the figures of the Isura report.  (Pl. FF, at 52.) Not so.  Jiaherb has the burden of proof and it put all its eggs in one basket:  that the saw palmetto oil was adulterated with coconut oil and the Isura report proves it.  Dr. Wang's specific challenges to what Figures 1 and 2 demonstrate fatally weaken the coconut oil adulteration theory.  As a result, Jiaherb has not proven that MTC breached its obligations under the parties' contract.

### 3.  Breach of Implied Covenant of Good Faith and Fair Dealing (Count Four)

In New Jersey, "every contract contains an implied covenant of good faith and fair dealing," which "dictates that a party, even if it does not breach an express term, cannot act in bad faith to interfere with the other's ability to enjoy the fruits of the contract."  *Luongo v. Village Supermarket, Inc.*, 261 F. Supp. 3d 520, 531 (D.N.J. 2017) (McNulty, J.).  To establish a breach, a plaintiff must prove that "(1) a contract exists between the parties; (2) the plaintiff

---

[19]  Dr. Wang also persuasively rebutted Kababick's conclusions as to the Eurofins report.  Dr. Wang pointed out that Eurofins used an undisclosed "internal method" in its analysis of the saw palmetto oil.  (T4 639:14-641:16, 642:17-645:9 [P. Wang].)  He therefore opined that he could not verify the conclusions of the report or confirm that Eurofins complied with the requirements of USP 37.  (T4 641:8-642:11, 645:10-13 [P. Wang].)  As USP 37 compliance is what the parties' contract requires, the uncertainty surrounding what Eurofins's "internal method" is cannot prove Jiaherb's claim of adulteration by a preponderance.

performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose

of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions

caused the plaintiff to sustain damages." *Id.* at 531-32; *see Wade v. Kessler Inst.*, 343 N.J.

Super. 338, 348 (App. Div. 2001), *aff'd as modified*, *Wade v. Kessler Inst.*, 172 N.J. 327 (2002).

This implied warranty "is to be construed narrowly and utilized only when gaps exist as to the

parties' intentions." *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, 2013 WL 6048720,

at *3 (D.N.J. Nov. 14, 2013) (Kugler, J.).  As such, a breach "must not arise out of the same

conduct underlying an alleged breach of contract action." *Id.*

Again, this claim arises out of Jiaherb's contention that MTC misrepresented the quality

of its saw palmetto oil.  (T1 16:13-17:12, 31:21-32:18, 59:19-62:25 [Chen].)  This is the same

allegation that gives rise to Jiaherb's breach of contract claim and is therefore duplicative.  *See*

*TBI Unlimited*, 2013 WL 6048720, at *3 (dismissing the defendants' counterclaim for breach of

the covenant of good faith and fair dealing where that cause of action was "based on the same

conduct that has given rise to their breach of contract claims" and where the terms of the parties'

contract were clear).  Additionally, Jiaherb offered no evidence that MTC acted in bad faith

when it entered into the parties' contract.

### 4.  Breach of Implied Warranties (Counts Five and Six)

As to Jiaherb's warranty claims, contracts between merchants carry implied warranties

including the warranties of merchantability and fitness for a particular purpose.  *See* N.J. Stat.

Ann. § 12A:2-314.  In New Jersey, goods must be "merchantable," that is, "fit for the ordinary

purposes for which such goods are used." *Id.*  Further, goods must be fit for a particular purpose

"[w]here the seller at the time of contracting has reason to know any particular purpose for which

the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." *Id.* at -315.

The implied warranties of merchantability and fitness "protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Crozier v. Johnson & Johnson Consumer Cos.*, 901 F. Supp. 2d 494, 509 (D.N.J. 2012) (Simandle, C.J.) (quoting *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)).  To establish a breach of either warranty, a plaintiff "must show that the [product] they purchased from defendant was defective." *Id.* (quoting *Altronics of Bethlehem*, 957 F.2d at 1105).

Jiaherb has not proven that MTC's saw palmetto oil was adulterated with coconut oil or that its quality failed to comport with the terms of the parties' contract or industry standards. There is thus no evidence that the product was defective.  *See id.* (dismissing the plaintiffs' claims for breach of the implied warranties of merchantability and fitness because they did not "show[] that the [product] was defective or that it operated improperly").

### 5. *Unjust Enrichment (Count Seven)*

Finally, Jiaherb's unjust enrichment claim also fails.  It is undisputed that the parties entered into a valid contract for the purchase and sale of saw palmetto oil.  When the validity of a contract is not disputed, unjust enrichment is not an available remedy.  *Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 n.8 (3d Cir. 2014); *see Brown v. HSBC*, 2025 WL 947728, at *7 (D.N.J. Mar. 28, 2025) (Shipp, J.) (unjust enrichment claim dismissed where the plaintiff did not contest validity of contract and claim was based on the same allegations as breach of contract claim).

**V.**    **Conclusion**

Jiaherb has not carried its burden of proof on its claims.  Final judgment is therefore warranted in MTC's favor and against Jiaherb on all counts in the amended complaint.  An appropriate order will issue.


Date:  September 5, 2025                    */s/ Katharine S. Hayden*
                                            Katharine S. Hayden, U.S.D.J.